**No. 25-30189**
**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

Liberty Mutual Insurance Company,

Plaintiff - Appellee

v.

Royal White Cement, Incorporated,

Defendant - Appellant

**On Appeal from**

United States District Court for the Eastern District of Louisiana

2:23-CV-3258

**BRIEF OF APPELLANT ROYAL WHITE CEMENT, INCORPORATED**

SUBMITTED BY:

Harry E. Morse
Bohman Morse, L.L.C.
400 Poydras Street
New Orleans, LA 70130

Cayce Peterson
JJC Law, LLC
111 Veterans Memorial Blvd
Metairie, LA 70005

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Liberty Mutual Insurance Company | Robert Mahtook and Kaliste Saloom of Mahtook & Lafleur, L.L.C. Lafayette, LA |

| Appellants: | Counsel for Appellants: |
|---|---|
| Royal White Cement, Incorporated | Harry Morse of Bohman Morse, L.L.C. New Orleans, LA and Cayce Peterson of JJC Law, LLC, Metairie, LA |

S/Harry E. Morse
Attorney of record for
Royal White Cement

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. The district court's opinion, if upheld, would materially change the meaning and effect of sue and labor clauses in insurance policies.

# TABLE OF CONTENTS

**Contents**………………………………………………………………**Pages**

Table of Contents ................................................................................iv

Table of Authorities .............................................................................vi

   I.  Jurisdictional Statement....................................................................1

   II.  Statement of the Issues ....................................................................1

   III. Statement of the Case .....................................................................1

       1.  Royal White Cement shipped cement from Egypt to New Orleans, then Houston, and suffered a casualty between New Orleans and Houston......1

       2.  Royal White's coverage under the cargo policy.........................................4

       3.  Liberty Mutual denied coverage, conflating demurrage of the vessel with delay of the cargo ...................................................................5

   IV. Summary of the Argument.................................................................6

   V.  Argument ..........................................................................................8

       1.  Standard of Review .................................................................8

       2.  Interpretation of insurance policies .........................................9

       3.  The plain language of the policy provides coverage for this demurrage charge...................................................................10

          A. Liberty Mutual's cargo policy covers Royal White's demurrage claim as a sue and labor expense................................................10

          B. The district court's holding that a demurrage charge from the vessel is delay of the cargo is legally mistaken .................................................17

C. The district court's opinion is contrary to all prior cargo policy jurisprudence ...................................................................................23

D. The existence of demurrage for containers under the policy further establishes that demurrage is not delay ...............................................25

VI.  Conclusion .................................................................................................27

Certificate of Service .................................................................................................28

Certificate of Compliance .........................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AGCS Marine Ins. Co. v. World Fuel Services, Inc.*,
220 F.Supp. 3d 431 (S.D.N.Y. 2016) ...................................................23

*American Merchant Marine Insurance Co. v. Liberty Sand & Gravel Co., Inc.*,
282 F. 514 (3d Cir. 1922) ...................................................................12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................................9

*Archer Daniels-Midland v. Phoenix Assur. Co.*,
975 F.Supp. 1137 (S.D. Ill. 1997) .........................................................26

*Armada Supply Inc. v. Wright*,
858 F.2d 842, 853 (2d Cir. 1988) ..........................................................23

*Berns & Koppstein, Inc. v. Orion Insurance Co*,
170 F.Supp. 707 (S.D.N.Y.1959) ..........................................................15

*Brackeen v. Haaland*,
994 F.3d 249 (5th Cir. 2021) .................................................................9

*Caemint Food, Inc. v. Brasileiro*,
647 F.2d 347 (2d. Cir. 1981) ................................................................22

*Collins v. A.B.C. Marine Towing, L.L.C.*,
No. 14-CV-1900, 2015 WL 5797793 (E.D. La. Oct. 2, 2015)...................... 13, 20

*Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC*,
615 F.3d 599 (5th Cir. 2010) .................................................................9

*Commodities Reserve Co. v. St. Paul Fire & Marine Ins*,
879 F.2d 640 (1989)........................................................................ 24-25

*Continental Food Prods., Inc. v. Ins. Co. of N. Am.*,
554 F.2d 834 (5th Cir. 1977) ............................................................ 13, 15

*Fireman's Fund. Ins. v. Tropical Shipping & Const.*,
254 F.3d. 987, 1006 (11th Cir. 2001) ...................................................................10

*Home Ins. Co. v. Ciconett*,
179 F.2d 892 (6th Cir.1950) ...................................................................15

*Homaidan v. Sallie Mae, Inc.*,
3 F.4th 595 (2d Cir. 2021) ...................................................................23

*Hugo Boss Fashions v. Federal Ins. Co.*,
252 F.3d 608, 615 (2d Cir. 2001) ...................................................................18

*Ingersoll Mill. Mach. Co. v. M/V BODENA*,
829 F.2d 293 (2d. Cir. 1987) ...................................................................10

*Lanasa Fruit Steamship & Importing Co v. Universal Ins. Co.*,
302 U.S. 556 (1938)...................................................................25

*Lincoln General Ins. Co. v. Reyna*,
401 F.3d 347 (5th Cir. 2005) ...................................................................21

*Nati'l Fidelity Life Ins. Co. v. Karaganis*,
811 F.2d 357, 361 (7th Cir.1987) ...................................................................10

*Nat'l Union Fire Ins. Co. v. Carib Aviation*,
759 F.2d 873 (11th Cir.1985) ...................................................................10

*Ortega Garcia v. United States*,
986 F.3d 513, 524 (5th Cir. 2021) ...................................................................9

*QBE Ins. Corp. v. Brown & Mitchell, Inc.*,
591 F.3d 439 (5th Cir. 2009) ...................................................................9

*Reliance Ins. co. v. The Escapade*,
280 F.2d 482 (5th Cir. 1960) ................................................... 12, 14, 25

*RK Mechanical, Inc. v. Travelers Property Cas. Co.*,
944 F.Supp.1013 (D. Colo. 2011)...................................................................15

*Terwilliger v. Terwilliger,*
  206 F.3d 240, 245 (2d Cir. 2000) ........................................................... 18

*Vana Trading Co., Inc. v. SS METTE SKOU,*
  556 F.2d 100, 104 (2d Cir. 1977) ........................................................ 22

*White Star SS Co. v. North British & Merc. Ins. Co.,*
  48 F.Supp.808 (E.D. Mich. 1945) ....................................................... 12

*Wilburn Boat Co. v. Fireman's Fund Ins. Co.,*
  348 U.S. 310, 321 (1955) ..................................................................... 9

## Statutes and Other Authorities

Fed. R. Civ. P. 56(a) ................................................................................ 9

Arnould on Marine Insurance, 12th Ed., § 871 ....................................... 13

Vance Insurance (2d ed. 1930) § 255 ...................................................... 15

Couch on Insurance 2D (1966) § 55:125 ................................................. 15

# JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered a final judgment on February 24, 2025, which was appealed on March 25, 2025.

# STATEMENT OF THE ISSUES

Whether the district court correctly concluded under maritime law (supplemented by New York law) that the exclusion for delay damages in a marine cargo policy also excludes demurrage damages, and further, that demurrage cannot be covered under the policy as a sue and labor expense.

# STATEMENT OF THE CASE

1. *Royal White Cement shipped cement from Egypt to New Orleans, then Houston, and suffered a casualty between New Orleans and Houston.*

Royal White Cement is a cement company, and provides cement to its customers in the United States, sourcing the cement worldwide and shipping it to ports here. It has a cargo policy to cover the cement it ships. This policy was issued by Liberty Mutual No. HOOMC10959305, with a policy period of 7 February 2022 to 7 February 2023. ROA.31-66.

When Royal White would anticipate a shipment of cement, it would obtain an endorsement from its cargo underwriter for that shipment. It did that here, voyage-chartering the M/V WECO HOLLI for transport of bagged cement from Port Said,

1

Egypt, to New Orleans and Houston. Royal White obtained an endorsement to cover

this shipment. ROA.139. That endorsement, dated June 22, 2022, provides:

**Marine Cargo Policy**

## LIBERTY MUTUAL INSURANCE COMPANY
(A Massachusetts Stock Insurance Company, hereinafter the "Company")

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

#### ENDORSEMENT NO. 14

| | |
|---|---|
| **Effective Date:** | June 22, 2022 |
| **Policy Number:** | HOOMC10959305 |
| **Issued To:** | Royal White Cement, Inc. |

#### M/V Weco Holli

In consideration of an **Additional Premium of USD $5,000**, it is understood and agreed that coverage under this policy is extended to cover the bulk shipment of approximately 59.8 M/T of White Cement in Jumbo Bags valued at $7,250,000 scheduled to depart Egypt on or about June 22, 2022, described below

**Shipment Details:**
**Geography:** Egypt to New Orleans, LA and Houston, TX
**Vessel:** M/V Weco Holli
**Insured Value:** $7,250,000
**Deductible:** $25,000 each and every occurrence

Subjectivity - all cargo must be stowed under deck

### ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____    _____
PRESIDENT                  VICE-PRESIDENT and SECRETARY
David H. Long              Mark C. Touhey

Issued: June 27, 2022

This appeal does not exist because the shipment went smoothly.  The bags of cement

were to go to New Orleans, where a portion would be offloaded, and then continue

2

to Houston, where the balance would be offloaded. In fact, the first portion of bagged cement was offloaded in New Orleans. When the M/V WECO HOLLI got to Houston, though, there was a problem: some of the cement had collapsed, allegedly because the people responsible for offloading in New Orleans had removed columns of cement rather than rows – that is, rather than removing the top layer of cement, then the next (like taking the top story off a skyscraper), they had left it the same height, only with a smaller footprint (like taking out all the northwest corner offices on that same skyscraper). Anyone who has built a sandcastle could predict what would happen next: the cement, just as tall but narrower, with an adjacent void, collapsed. The bags were ripped open, creating both difficulty unloading the rest of the bagged cement, and the need to clean the cement that had spilled in the hold. The vessel and crew needed to address that problem in Houston. ROA.27-28. That dispute is litigated in E.D. La. C/A No. 23-788.

In Houston, Royal White had a problem not of its own making: it had a valuable cargo, insured for $7,250,000, and a mess in the M/V WECO HOLLI. Some of the cargo was destroyed. Some of the cargo had to be cleaned out of the hold of the vessel. Liberty Mutual paid $850,000 to Royal White for the damaged and destroyed cargo, and for the cleaning. ROA.214. Meantime, the M/V WECO HOLLI had to be held at the dock while the cleaning could be accomplished, and the vessel charged Royal White demurrage because the vessel was at port, rather than going on

3

to make money. Demurrage is called-for in the contract, at $33,000 per day in Houston. ROA.183. The vessel was held for twenty-two days and nine hours, resulting in a demurrage charge of $738,512.50. ROA.187-88.

### 2. *Royal White's coverage under the cargo policy*

Liberty Mutual had in place a cargo policy. ROA.90-139. That policy, in its insuring conditions, covers all goods and merchandise against certain risks: here, that is "against all risks of physical loss or damage from any external cause irrespective of percentage, but excluding, nevertheless, the risks of F.C.&S. (Free of Capture and Seizure) Warranty and the S.R.&C.C (Strikes Riots and Civil Commotions) Warranty and/or other warranties or exclusions represented within this policy, unless covered specifically elsewhere herein." ROA.91 at ¶ 6(a).

Separately, the policy covers sue and labor expenses:

> In case of any loss or misfortune, it shall be lawful and necessary to and for The Insured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods insured, or any part thereof, without prejudice to this insurance.

> The acts of The Insured or The Company, in recovering, saving and preserving the goods insured, in case of disaster, shall not be considered a waiver or an acceptance of an abandonment. Subject always to the applicable limit of liability, sue and labor charges are payable irrespective of percentage.

ROA.104-05, ¶ 29.

The policy also has warranties and exclusions. Relevant here, the policy contains an exclusion titled "Delay and inherent vice," which provides:

> This policy is warranted free from claims for loss of market or loss, damage, deterioration, and expense arising from delay, whether caused by a peril insured against or otherwise, including from inherent vices (or nature) of the insured good(s) itself.

ROA.109, ¶ 40.

The policy mentions demurrage only once, in relation to containers, not cargo:

> This policy shall cover demurrage charges and/or late penalties assessed against and paid by The Insured for late return of containers when said containers are retained by The Insured at the instruction of The Company for inspection by The Company's surveyor in investigation of loss or damage recoverable under this policy.
>
> The time period for which The Company shall be liable for said charges and/or penalties shall begin at the time The Company instructs The Insured to retain the containers for inspection and end at the time The Company's surveyor instructs The Insured to return the containers.

ROA.112, ¶ 52.

   3. *Liberty Mutual denied coverage, conflating demurrage of the vessel with delay of the cargo.*

Liberty Mutual filed a complaint, then an amended complaint, in the Eastern District of New Orleans. ROA.25-30. Liberty Mutual argued that "[a]s the bags of cement were shipped in bulk rather than containers, and the demurrage charges were not for delay in returning containers to their owner, the Policy does not provide coverage for demurrage." ROA.29, ¶ 18. Royal White asked the Court for declaratory judgment. Royal White, in turn, filed an answer and a counter-claim. ROA.79-89. The parties filed cross-motions for summary judgment. The district

5

court ruled in favor of Liberty Mutual and against Royal White. ROA.433. This appeal timely followed. ROA.434.

## SUMMARY OF THE ARGUMENT

A cargo policy insures the cargo, not the vessel it is shipped in. When a cargo policy excludes delay, it excludes a claim for delay of the cargo, not delay of the vessel. If the cargo takes too long to get to its destination and the cargo owner loses a sale, there is no coverage. Demurrage is not delay: demurrage is when the vessel is held at the dock, and the vessel charges the cargo owner because of that. Ordinarily, demurrage is not covered under a  cargo policy either, not because it is delay, but because the cargo policy does not cover the vessel. Demurrage becomes a covered loss only when there is a covered claim and the cargo owner incurs demurrage in suing and laboring to preserve the cargo. Before the district court ruled otherwise, demurrage from a vessel has never been held to be excluded as delay, even though delay has been an excluded cargo risk for more than a century.

A cargo policy is a first-party insurance policy. If the cargo is, say, lost at sea, the insured is out its valuable property – here, over $7,000,000 – and it is made whole by the cargo policy. The delay and inherent vice exclusion in the cargo policy provides that if the cargo is merely delayed and loses value because of that delay, or if the cargo has some sort of inherent vice that takes effect because of delay – the classic example is bananas turning black – then there is ordinarily no coverage for

that risk, although that blanket statement must be qualified by more than a century of case law on the issue.

Third-party risks are traditionally not covered under a cargo policy in the first place. If the cement contains asbestos and sickens a stevedore, who then files suit, the cargo underwriter will not respond. That is not because of the policy's asbestos exclusion, but because the policy is a property policy, not a liability policy.

Sue and labor expenses, on the other hand, are expressly covered under the cargo policy. The insured is covered for the loss of its cargo, so it would otherwise have no economic incentive to preserve the cargo and stop a small casualty (some of the cement gets wet) from turning into a large casualty (the rest of the cement gets wet). Therefore, cargo policies have traditionally covered sue and labor expenses, where the assured sues and labors to fix a casualty, preserving the value of the cargo. The sue and labor clause turns what would ordinarily be third-party expenses for remediation into a covered claim. If there is no covered claim in the first place, though, there can be no sue-and-labor claim. The assured can't help the underwriter by suing and laboring to fix a problem when the underwriter is not responsible for the problem.

Here though, there is a covered claim, and demurrage was incurred to remediate the covered claim as a sue and labor expense. There was a casualty: Royal White's cement, in the hold of the M/V WECO HOLLI, partially collapsed. This

7

was a covered loss, which we know because Liberty Mutual paid it. Royal White sued and labored to offload cargo and to clean up the vessel. To do so, it had to keep the M/V WECO HOLLI at the Houston dock. The vessel, which could not continue to the next port, charged demurrage to Royal White, but that demurrage charge was charged so Royal White could preserve the cargo. That is a sue and labor expense.

Demurrage is not delay. Delay is a cost borne by the insured because the cargo took longer than it should have. Delay is delay of the cargo. Demurrage, on the other hand, is a cost imposed on the insured by a vessel owner, and it is not covered in the first place. Demurrage only becomes covered when it is incurred as part of the insured suing and laboring to respond to a covered loss. This simple holding is consistent not just with the plain language of the policy, it is consistent with all prior case law in cargo and hull policies on sue and labor coverage.

## ARGUMENT

### 1. Standard of Review

This Court reviews a grant of summary judgment de novo, applying the same standard as the district court. *Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC,* 615 F.3d 599, 604 (5th Cir. 2010) (quoting *QBE Ins. Corp. v. Brown & Mitchell, Inc.,* 591 F.3d 439, 442 (5th Cir. 2009)). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material

8

fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Brackeen v. Haaland,* 994 F.3d 249, 290 (5th Cir. 2021) (*en banc*) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In reviewing the record, we view "all the facts and evidence in the light most favorable to the non-movant." *Ortega Garcia v. United States,* 986 F.3d 513, 524 (5th Cir. 2021).

## 2.  *Interpretation of insurance policies*

The Liberty Mutual policy applies general maritime law, supplemented with New York law in the event there is no applicable maritime rule. ROA.117,  ¶ 69. There is no specific federal rule governing construction of maritime insurance contracts. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 321 (1955). Under New York law and admiralty law, the starting point in interpreting an insurance policy is to determine whether the policy terms are ambiguous. As a general rule, plain or unambiguous language will be given its ordinary meaning and effect, and the need to resort to rules of construction arises only when an ambiguity exists. See *Ingersoll Mill. Mach. Co. v. M/V BODENA*, 829 F.2d 293, 306 (2d. Cir. 1987), citing *National Fidelity Life Ins. Co. v. Karaganis,* 811 F.2d 357, 361 (7th Cir.1987). Courts may not create an ambiguity where none exists. *Simmons Refining Co. v. Royal-Globe Ins. Co.,* 543 F.2d 1195, 1197 (7th Cir.1976). If an insurance contract is ambiguous, it will generally be construed against the insurer who drafted

9

it in order to promote coverage for losses to which the policy relates. *Ingersoll Mill*, 829 F.2d at 306. This principle applies to all types of insurance policies including maritime policies. *Nat'l Union Fire Ins. Co. v. Carib Aviation,* 759 F.2d 873, 875 (11th Cir.1985).

An "all risk" policy like the Liberty Mutual policy, typically works in favor of the insured. "Once the insured establishes a loss apparently within the terms of an 'all risks' policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted." *Fireman's Fund. Ins. v. Tropical Shipping & Const.*, 254 F.3d. 987, 1006 (11th Cir. 2001) (cleaned up).

    *3.  The plain language of the policy provides coverage for this demurrage charge.*

    A. Liberty Mutual's cargo policy covers Royal White's <u>demurrage claim as a sue and labor expense.</u>

Liberty Mutual's policy is an all-risk cargo policy that covers "all shipments of lawful goods and/or merchandise properly packaged for transportation." ROA.91, ¶ 6. Paragraph 6 of the declarations page lays out coverage: the cargo policy insures Royal White Cement's goods and/or merchandise "[a]gainst all risks of physical loss or damage from any external cause irrespective of percentage, but excluding,

nevertheless, the risks F.C.&S. (Free of Capture and Seizure) Warranty and the S.R.&C.C. (Strikes Riots and Civil Commotions Warranty) [. . .].[1]

Paragraph 29 of the policy (ROA.104-05) covers sue and labor expenses. The coverage dispute here is not about the loss of some of the cargo. The coverage dispute involves only the demurrage charge for holding the M/V WECO HOLLI while the cargo was being offloaded and the mess cleaned up. This is a classic sue and labor expense, and is covered as such.

Sue and labor clauses are considered supplementary cover: a sue and labor expense is not one that involves the loss of the cargo; it involves the assured working to preserve the cargo for underwriters' benefit. As Judge Brown explained, "an assured has the duty toward his underwriter to exercise the care of a prudent uninsured owner to protect insured property in order to minimize or prevent the loss from the occurrence for which the underwriter would be liable under the policy." Therefore, the sue and labor coverage "undertakes to reimburse the assured for these expenditures which are made primarily for the benefit of the underwriter either to reduce or eliminate a covered loss altogether." *Reliance Ins. co. v. The Escapade*,

---

[1] At Paragraph 12 (ROA.99), the policy incorporates the policy declaration page's Paragraph 6 (ROA.91), quoted above.

280 F.2d 482, 488 (5th Cir. 1960). If there is no coverage for the loss in the first instance, though, then there is no concomitant sue and labor coverage. *Id.* at 489.[2]

Or, as explained in *White Star SS Co. v. North British & Merc. Ins. Co.*, 48 F.Supp.808, 812-13 (E.D. Mich. 1945), "[t]he law is well settled that the sue and labor clause is a separate insurance and is supplementary to the contract of the underwriter to pay [for the thing insured]." The purpose of the sue and labor clause "is to encourage and bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss." Under sue and labor coverage, "the assured recovers the whole of the sue and labor expense which he has incurred, subject to the expense having been proper and reasonable in amount under all the circumstances, and without regard to the amount of the loss or whether there has been a loss [. . .]" *Id.*[3]

Royal White would not ordinarily think that this is in dispute: that sue and labor clauses are considered supplementary cover, but that they only operate when there is a covered loss, is fundamental in marine insurance. However, the district court found (ROA.430) that "the demurrage is not covered as a sue and labor

---

[2] *Reliance* involves a hull policy. As there is more case law on sue and labor clauses under hull policies than under cargo policies, and the concept (and wording) is the same in both, it is instructive to look at both, just as the district court did.

[3] Citing, *inter alia, American Merchant Marine Insurance Co. v. Liberty Sand & Gravel Co., Inc.,* 282 F. 514 (3d Cir. 1922); Arnould on Marine Insurance, 12th Ed., § 871.

expense," and further, that "if the policy does not cover the loss, there is no duty to reimburse the insured for sue and labor expenses linked to that loss." (citing *Collins v. A.B.C. Marine Towing, L.L.C.*, No. 14-CV-1900, 2015 WL 5797793, at *5 (E.D. La. Oct. 2, 2015)). The district court further found that "sue and labor clauses do not 'operate as an enlargement of the perils underwritten against.' The upshot is that an insurer need not reimburse an insured under a sue and labor clause 'where the policy . . . does not afford coverage.' *Id.* Just so here." (Citing *Continental Food Prods., Inc. v. Ins. Co. of N. Am.*, 554 F.2d 834, 837 (5th Cir. 1977)). So holding, the district court found that even though there was a covered loss (the collapse of bags of cement) and even though demurrage is a charge appendant do that (it was necessary to hold the vessel at the dock to remedy the collapse and offload the rest of the cargo), demurrage was not a sue and labor expense.

The district court combined two steps into one. Properly understood, sue and labor expense requires a covered loss: a vessel starts taking on water (if the sue and labor clause is in a hull policy), say, or a portion of the cargo is damaged (in a cargo policy). At that point, the underwriter is already on for some portion of the claim. To prevent that smaller claim from turning into a bigger problem, the assured is obligated to take prompt action to remedy the circumstance. The costs associated with that prompt action are sue and labor expenses.

If, on the other hand, the underlying claim were not covered, then there is no back-door coverage under the sue and labor clause. If the hull policy provides a private-use warranty, limiting the use of the vessel to private use and not commercial use, and the vessel was stranded during commercial use, then there is no sue and labor expense to rescue the vessel in because the insured is not mitigating anything for the benefit of the assurer: there is no covered loss to alleviate.[4] Or, in the cargo context, say Royal White were shipping bananas instead of cement, and the bananas turned from green to yellow to black over an ordinary voyage. The assured would not have a cargo claim because bananas turning black is an inherent vice of bananas, and the policy has an inherent vice exclusion. The assured would still have to shovel the black bananas from the vessel's hold and would likely incur demurrage to do so, but neither the shoveling expenses nor the demurrage would give rise to a sue and labor expense because the assured was not helping to remedy a claim the underwriters would ever have to pay.

This simple holding: sue and labor cover is supplemental cover for actions taken to remediate a covered loss, but it has no applicability toward an uncovered loss – is a summary of a few centuries of consistently-applied case law.[5] As one

---

[4] This is just what transpired in *Reliance*, only the underwriter was estopped for failure to raise the denial timely.

[5] See generally *RK Mechanical, Inc. v. Travelers Property Cas. Co.*, 944 F.Supp.1013, 1024-26 (D. Colo. 2011) (outlining the issue in depth and collecting cases).

treatise explains, "the loss or damage which the insured labors to avoid must be such that it would be chargeable to the insurer if it should occur. The purpose of the clause is not to stimulate philanthropic heroism, but to lessen the loss for which the underwriter would be liable." Explaining further: "The insurer is certainly not commercially interested in securing protection of the venture against a misfortune for which he had declined to assume responsibility." *Vance Insurance* (2d ed. 1930) § 255 p. 865.[6]

This Court held in *Blasser Bros. v. Northern Pan-American Line*, 628 F.2d 376, 386, that "[a]ny action which Blasser Brothers took to preserve the cargo or mitigate damages would clearly be includible" as sue and labor expenses. Under all these cases, demurrage, when incurred to remedy a covered claim (as it was here), is properly a sue and labor expense and must be reimbursed as such.

The district court, though, cited a different line of cases where there was no sue and labor coverage. In all those cases, unlike the facts here, there was no underlying coverage for the loss. The district court cited *Continental Food Products Inc. v. Ins. Co. of N. Am.*, 544 F.2d at 836-67, where this Court held that there are no sue and labor expenses when there is no underlying covered peril. There, the cargo was frozen meat, and it had thawed, but the assured made no effort to show that the

---

[6] See also *Home Ins. Co. v. Ciconett* 179 F.2d 892, 895 (6th Cir.1950); *Berns & Koppstein, Inc. v. Orion Insurance Co.* 170 F.Supp. 707, 719 (S.D.N.Y.1959); 15 COUCH ON INSURANCE 2D (1966) § 55:125, pp. 552-553.

thawing occurred because of a covered peril. With no underlying covered peril, then sue and labor coverage was not triggered.

The district court cited *A.B.C. Marine Towing, L.L.C.* There, the issue was simpler still. Boh Bros' crane barge was damaged when it hit the Florida Avenue bridge, and Boh sought cover under the sue and labor clause for ordinary costs to respond to the casualty. So far, so good. The problem for Boh was that Boh sought sue and labor coverage under the tug's hull policy, not Boh's hull policy. Boh's barge was not on the schedule of insured vessels for the tug's hull policy, and therefore, Boh did not have coverage under that policy. Because the hull underwriter would never be responsible for damage to the barge – it didn't insure Boh's barge, after all – it did not have to pay sue and labor expenses.[7] The case here would be roughly equivalent to Royal White seeking coverage under the vessel's hull policy instead of its own cargo policy, which would plainly be a nonstarter.

Here there is a covered peril: the collapse of cement in the hold, which damaged the cargo and necessitated cleanup. Liberty Mutual admits as much, telling the district court that Liberty Mutual paid $850,000 to Royal White, both for the damaged cargo and for the cleanup. ROA.214. Demurrage is otherwise a proper sue

---

[7] The district court held: "An underwriter likely would not agree to provide hull insurance, separate from the scheduled vessels listed in the policy, when the underwriter would be unable to ascertain the value of the property he was to insure. Additionally, it should be noted that Boh purchased its own hull coverage, including for sue and labor expenses, on its Crane Barge from a different insurer."

and labor expense. Again, it is necessary to effectuate the cleanup and offloading of the cargo. To Royal White's research, and in all the cases cited by Liberty Mutual and by the district court, there has never, before the district court's opinion, been a holding that an appropriate sue and labor expense appendant to a covered claim is not covered. If there were no coverage for the collapsed cargo for whatever reason, then there would be no sue and labor coverage. Where there is coverage for the casualty, and where Liberty Mutual admits there is, then there is likewise coverage for the sue and labor expenses.

B. The district court's holding that a demurrage charge from the vessel is delay of the cargo is legally mistaken.

In light of the foregoing, Royal White respectfully submits that the better reading of the district court's opinion is not that there is no covered loss, so there can be no sue and labor expenses. There was, after all, a covered loss, paid-for by Liberty Mutual, and demurrage was an expense incurred to remediate the covered loss. It may be instead that the district court reasoned that demurrage is a species of delay, that delay is excluded, and the delay exclusion trumps sue and labor coverage.

This interpretation, if it were offered, would face significant hurdles, both legal and practical. Legally, the district court's opinion would seemingly violate the rule of construction that a contract should be read to cohere, and to give a sensible meaning to the whole. See generally *Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir. 2000) ("[T]he entire contract must be considered, and all parts of it

17

reconciled, if possible, in order to avoid an inconsistency.") It would further emphatically violate New York's contra preferentem rule, because an insurance policy should not be read to give with the left hand and take away with the right. See *Hugo Boss Fashions v. Federal Ins. Co.*, 252 F.3d 608, 615 (2d Cir. 2001) ("Where there is ambiguity as to the existence of coverage, doubt is to be resolved in favor of the insured and against the insurer.")  The holding would likewise run afoul of the entire history of case law on sue and labor expenses, all of which provide that the assured "recovers *the whole of* the sue and labor expense which he has incurred, subject to the expense having been proper and reasonable in amount under all the circumstances." See *Home Ins. Co. v. Ciconett*, 179 F. 2d 892, 895 (6th Cir. 1950) (emphasis added).

Practically, the challenges would mount. Take this casualty, with collapsed cement in the hold of the vessel. To sue and labor and remediate the problem, Royal White would have to hire contractors to clean the hold of the vessel; to rent equipment to dispose of the damage product; and to hire warehousing for the undamaged product. The delay and inherent vice exclusion applies to "expense arising from delay." The workers and equipment to remedy the problem may not fall under this exclusion, but the underwriter would likely argue that warehousing would likely be downstream of delay – it is an unplanned expense that involves holding the cargo – and is not covered. So too, demurrage, as the district court held here. But

this result does not follow: there is no through-line between personnel, equipment, and disposal costs on the one hand, versus warehousing and demurrage costs on the other. All these costs are necessitated by a covered peril; all are incurred by the insured to fix what went wrong as best as able for the benefit of the cargo underwriter. The assured would have much less incentive to sue and labor and remediate problems.

It is no surprise, then, that the ordinary reading of the delay exclusion does not apply to demurrage. Demurrage is a third-party cost. It comes in the form of an invoice to the cargo owner from a vessel owner. Delay is a first party loss incurred by the assured directly. Again, the policy exclusion "Delay and inherent vice" provides:

> This policy is warranted free from claims for loss of market or loss, damage, deterioration, and expense arising from delay, whether caused by a peril insured against or otherwise, including from inherent vices (or nature) of the insured good(s) itself.

Recall again that this is a cargo policy – it is a first-party policy that covers the subject matter, not a third-party policy that covers to liability to others. The policy covers the assured's cargo: at ¶ 5, the policy is explicit: the goods insured under this policy are "all shipments of lawful goods and/or merchandise properly packaged for transportation" [. . .] Endorsement No. 14, which covers this shipment provides that the policy covers this shipment of "59.8 metric tons of white cement in jumbo bags valued at $7,250,000."

19

Therefore, where the policy excludes "delay and inherent vice," it excludes "delay and inherent vice" of the cargo, not delay and inherent vice of the vessel. Demurrage is not delay of the cargo and therefore it is not in the scope of the delay and inherent vice exclusion. The district court, citing to Black's law dictionary, the Oxford dictionary, and case law, reasoned that demurrage is a species of damages owed by the charterer to the shipowner for failure to load on time, and therefore, that it is a type of delay, without considering that demurrage does not give rise to a covered claim in the first instance.

If the cargo is delayed and, say, Royal White misses its contract for shipment, or the market changes and the value decreases, then Royal White would have coverage under the policy for loss of market to the cargo, but that claim would be plainly excluded under the delay and inherent vice exclusion. If the cargo were bananas, and they turned black, Royal White would have coverage: it lost the cargo. That claim too would be excluded under the same exclusion.[8]

If, however, Royal White just took a really long time to unload cargo, and the ship charged Royal White demurrage, and Royal White (foolishly) sent the

---

[8] Though the distinction is often elided because the result is the same, there is a difference between not having coverage in the first place (trying to claim hull cover on a barge that is not listed on the hull policy's schedule, as in *ABC*, *supra*) versus having coverage, but the claim falls within an exclusion (the covered bananas turn black). See generally *Lincoln General Ins. Co. v. Reyna*, 401 F.3d 347, 350 (5th Cir. 2005) ("It is the insured's burden to establish that a claim is potentially within the scope of coverage. Once the insured has established this, the burden shifts to the insurer to show that the plain language of a policy exclusion or limitation allows the insurer to avoid coverage [. . . ]")

demurrage invoice to its cargo underwriter, Liberty Mutual would not rely on the delay and inherent vice exclusion to exclude coverage. Instead, there would be no coverage in the first place because the cargo policy does not insure the ship, or Royal White's exposure to the ship. It just insures the cargo, and the insured's efforts to sue and labor to help the cargo. There is no coverage for that demurrage claim because that demurrage is not a cargo claim, just as there is no coverage for a claim if the cement sickened a stevedore who handled it. The cargo policy is a first-party policy.

Or assume instead that the vessel, rather than the cargo, had a latent unseaworthiness, and the vessel sank en route from Egypt to New Orleans. This would be an inherent vice, but an inherent vice of the vessel, not an inherent vice of the insured cargo. If Royal White presented the cargo claim to its underwriter for the lost cargo, one would hope the underwriter would not deny the claim by arguing there was inherent vice of the vessel. The question in the delay and inherent vice exclusion is not inherent vice of the vessel; the question is inherent vice of the cargo. If the cargo owner sought coverage for the loss of the cargo *and* the loss of the vessel, the loss of the cargo should be paid, and the loss of the vessel would be a nonstarter, with no mention of the inherent vice exclusion. But the district court here did the opposite, conflating a vessel claim with a cargo claim. Demurrage is a third-party vessel claim, not a first-party cargo claim. Unless demurrage were part of a sue and

labor expense, there would be no coverage in the first instance, and no need to look at the exclusion.

This conclusion – that delay and inherent vice is of the cargo – makes sense of the paragraph in full. Shown above, inherent vice of the vessel does not really follow, and is not a term known to the law. Inherent vice of the cargo is. See e.g. *Vana Trading Co., Inc. v. SS METTE SKOU*, 556 F.2d 100, 104 (2d Cir. 1977) (defining inherent vice as "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time"); see also *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347 (2d. Cir. 1981) (discussing inherent vice of the cargo). Paragraph 40 likewise establishes that there is no claim for "loss of market" or "loss, damage, deterioration, and expense arising from delay." These words all naturally apply to the cargo, which can be lost or damaged, can deteriorate, and can be delayed. They do not naturally apply to the vessel, which certainly can be lost or damaged, but is not thought to deteriorate. Therefore the district court's interpretation, plucking "expense arising from delay" from its environs, runs afoul of the interpretative canon noscitur a sociis, that a word is known by the company it keeps. See e.g. *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 604 (2d Cir. 2021). Employing the canon "helps prevent a court from ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Id.* Reading the delay and inherent vice exclusion coherently shows that it only

applies when applied to cargo, not to the vessel, which is why the clause concludes by discussing "the insured good(s) itself."

   C.   The district court's opinion is contrary to all prior cargo policy
        jurisprudence.

   In 2016, these same facts were litigated in New York, with functionally identical policy wording (in the record at ROA.311-54), and a functionally identical delay exclusion (ROA.327). There, as here, there was a covered loss. There, as here, there were costs appendant to the loss, including demurrage. There, as here, the underwriter argued that demurrage was not covered (although there, the underwriter did not argue that demurrage was a species of delay; AGCS instead argued that demurrage is not physical loss or damage to the cargo). The court rejected the argument and found coverage for demurrage under the cargo policy, citing the sue and labor clause. *AGCS Marine Ins. Co. v. World Fuel Services, Inc.*, 220 F.Supp. 3d 431, 440 (S.D.N.Y. 2016). The district court rejected this precedent as inapplicable. In fact, there, the New York court properly applied New York law.

   In *Armada Supply Inc. v. Wright*, 858 F.2d 842, 853 (2d Cir. 1988), the Second Circuit again held that demurrage is appropriate as a sue-and-labor expense when appendant to a covered loss. There, a shipment of fuel oil was contaminated with sea water. The cargo owner expended sums in reconditioning the fuel, and also incurred demurrage. The underwriter challenged demurrage, suggesting it was not recoverable under the cargo policy. The district court and the Second Circuit

disagreed. Explaining that "[s]ue and labor expenses are those reasonable costs borne by the assured to mitigate the loss and thus reduce the amount to be paid by the underwriter," the Second Circuit found that demurrage costs were "obviously reimbursable as a necessary step in the reconditioning process." It explained how to characterize sue and labor expenses: those expenses Armada faced because the oil did not arrive in sound condition are "a proper sue and labor expense." *Id.* at 854.

So too, the district court's interpretation of "delay" has been consistently, roundly rejected. The district court discarded the Ninth Circuit's analysis in *Commodities Reserve Co. v. St. Paul Fire & Marine Ins.*, 879 F.2d 640 (1989). There, Commodities Reserve shipped 1008 tons of chickpeas and 50 tons of cumin seeds to Venezuela. The vessel owner, without the cargo owner's knowledge, next took on munitions in Israel, but the vessel was detained in Greece for violating Greek regulations on the carriage of munitions. Commodities Reserve had its cargo shipped on a substitute vessel. There was an F.C. & S. (free of capture & seizure) exclusion in the policy. The cargo had been detained, and therefore, with no underlying covered loss, Commodities Reserve's efforts to get a replacement vessel were not a sue and labor expense.

Separately, and exactly relevant here, are litigation expenses. Commodities Reserve had paid legal expenses to obtain a court order to release the cargo not because of detention (an uncovered peril) but because of the captain's intransigence

in releasing the cargo (a covered peril). *Id.* at 645. The Ninth Circuit found that legal fees to secure the release of the cargo were a sue and labor expense. The policy did not cover legal expenses *qua* legal expenses; it covered them because they were incurred to avoid a covered peril. (This is the same holding as in *Reliance Ins. co.*, discussed at length above, and in all cases interpreting the sue and labor clause).

Critically, the St. Paul policy in *Commodities Reserve* had the same delay clause as in the Liberty Mutual policy. *Id.* at 642. St. Paul argued for the applicability of the delay clause to avoid the claim because the cargo was delayed. The Ninth Circuit rejected the argument because the legal expenses were sue and labor expenses, never mind the delay clause. *Id.* at 645. There is no way to square the district court's holding here with *Commodities Reserve*.[9]

D. The existence of demurrage for containers under the policy further establishes that demurrage is not delay.

The Liberty Mutual policy, at ¶ 52, covers "demurrage charges and/or late penalties assessed against and paid by the insured for late return of containers when said containers are retained by The Insured at the instruction of The Company for inspection by The Company's surveyor in investigation of loss or damage

---

[9] Much of the *Commodities Reserve* opinion turns on a question of proximate cause, citing *Lanasa Fruit Steamship & Importing Co v. Universal Ins. Co.*, 302 U.S. 556 (1938). A lengthy discussion of that case and the policy language response is found in *Archer Daniels-Midland v. Phoenix Assur. Co.*, 975 F.Supp. 1137 (S.D. Ill. 1997). Royal White's analysis here does not engage in the *Lanasa* line of cases because it is unnecessary. Royal White would only observe that in *Lanasa*, and in cases citing *Lanasa*, the question of whether the delay clause applies in a cargo policy is, universally, regarding delay of the cargo.

recoverable under this Policy." The district court reasoned that "if the policy did not generally exclude coverage for demurrage, there would have been no reason to include paragraph 52's carve-out" for demurrage for containers. ROA.429.

The opposite is true: it is not that the policy does not generally exclude demurrage; it is that the policy excludes containers, because – at the risk of repetition – the policy covers the cargo, not containers holding the cargo, and not vessels holding the containers holding the cargo. Just the cargo. It follows that in the event of damage to the cargo, the insurer would want to investigate the container, and should have to pay for that investigation. Because the policy covers the cargo, and not the container, there is otherwise no coverage for demurrage for the container, and this paragraph provides that coverage.

In so doing, paragraph 52 is not dissimilar from the sue and labor clause, but it serves a slightly different purpose: suing and laboring is done by the insured to mitigate a loss. Payment of demurrage for the container for the underwriter to investigate the loss is broader than sue and labor – it does not require an effort to mitigate – but there is a concomitant obligation (that the underwriter instruct the assured to hold the containers). Rather than showing an intent to exclude demurrage, this paragraph shows the underwriter's intent to encourage remediation, mitigation, and investigation, along with the sue and labor clause.

The use of demurrage here further illustrates that cargo underwriters, unsurprisingly, know what demurrage is. If cargo underwriters were inclined to exclude demurrage, they would label it "demurrage" and not delay. Again, they have no need to do so because the policy does not cover the vessel, and therefore it does not cover demurrage *unless* demurrage is a sue and labor expense. The policy covers sue and labor expenses, no matter how labeled, as long as there is an underlying covered claim.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed, and judgment entered in favor of Royal White.

SUBMITTED BY:
S/Harry E. Morse
Bohman Morse, L.L.C.
400 Poydras Street
New Orleans, LA 70130

Cayce Peterson
JJC Law, LLC
111 Veterans Memorial Blvd
Metairie, LA 70005

## CERTIFICATE OF SERVICE

I certify that on July 2, 2025, the foregoing document was forwarded via the Court's

CM/ECF Document Filing System, to all counsel.

<u>S/Harry E. Morse</u>

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 6642 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

This document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2506, in Times New Roman 14.

S/Harry E. Morse